**Jose REYES, Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 14–14–01002–CR**

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed March 15, 2016

Randall J. Ayers, Houston, TX, for Appellant.

Jessica Alane Caird, Houston, TX, for State.

## OPINION

Ken Wise, Justice

Appellant Jose Reyes was convicted of capital murder and sentenced to automatic life in prison. On appeal, appellant contends that the evidence is insufficient to prove beyond a reasonable doubt that he committed the murder in the course of committing kidnapping or aggravated sexual assault. He also contends that the trial court erred by admitting gruesome crime scene and autopsy photographs and a crime-scene video. We affirm.

### FACTUAL BACKGROUND

On February 4, 2014, fifteen-year-old Corriann Cervantes skipped school. When Corriann's father found out, he grounded her and told her to stay in her room for the rest of the day. Corriann became angry and left home after her father went to buy groceries. Corriann was wearing a "Rob Zombie" t-shirt the last time her father saw her.

Corriann went to meet her friend Randy Hurtado in a parking lot close to the apartment building where she lived. She and Randy then went to a nearby apartment complex so that Randy could buy a Xanax pill. Randy took the pill, and he and Corriann smoked marijuana together.

Corriann and Randy later met Victor Alas and his cousin Franklin Flores in the parking lot. The teens obtained more Xanax pills, but Randy refused to give Corriann any because he did not want her to get "all messed up." Around 4:00 or 5:00 p.m., however, Randy eventually agreed to give Corriann half of a pill. Then, around 5:00 or 6:00 p.m., the teens smoked more marijuana. Because it had gotten cold, they decided to go to the apartment of a woman they knew as Candy.[1]

Candy was a middle-aged woman who lived in the nearby Bays Apartments complex. Candy sometimes allowed teenagers to smoke marijuana and drink alcohol in her apartment. When the teens arrived, they continued smoking marijuana, and Candy joined them. Candy also offered them hard liquor. Randy saw Victor drinking liquor, and although he did not see it, Corriann might have had some. Candy thought that everyone drank that night, and they were all drunk, but Corriann had the most to drink. Candy agreed to let Corriann spend the night at Candy's apartment because Corriann claimed that her father would lock her out.

The teens remained at Candy's until around 9:00 p.m., when appellant, an acquaintance of the teens, showed up looking angry and demanding to see Corriann. By that time, Corriann was asleep in a bedroom because she was "pretty messed up." Randy had seen her "stumbling" an hour earlier. Appellant and Victor went to the bedroom to find Corriann. Not long after

1. Candy's real name is Tracy Ann Shively.

that, Randy left Candy's apartment because his mother had come to get him. Before Randy left, however, he told Victor to take Corriann home because she lived nearby.

Candy became upset that the boys were in her bedroom, and she asked them to leave so that she and Corriann could go to sleep. But Corriann said that she wanted to go to her friend Jocelyn's apartment, which was in Candy's complex. Candy asked Corriann if she was sure, and Corriann said that she was. Candy did not want Corriann to go alone because she was drunk, so Victor and the others offered to take Corriann to Jocelyn's apartment. Candy watched as appellant and Victor helped Corriann down the stairs; Franklin left with them.

Franklin later testified that he had known Corriann for about a year and considered her a friend. Franklin explained that on February 4, 2014, he, Corriann, Randy, and Victor went to the apartment of an older woman where they smoked marijuana and drank liquor for about an hour and a half. He knew Corriann drank the liquor and smoked marijuana with the others. Corriann looked "tired, [and] lost" and "had already had a few too many." He saw Corriann lie down on the sofa when the woman "told her it was best for her to go to bed."

After Corriann went to the bedroom, appellant arrived and said that he was looking for her. Appellant went into the bedroom where Corriann and Victor were. Shortly after that, the three came out of the bedroom, and appellant and Victor were helping Corriann because she kept falling. Franklin thought they were going to take Corriann home, but they took her someplace else.

Appellant and Victor took Corriann to a vacant apartment in the same complex. The apartment had no electricity and was very dark. Victor and appellant had to help Corriann up the stairs to the vacant apartment because she could not walk very well. The apartment was two stories inside, and on the second floor of the complex.

Once inside the apartment, Franklin, Corriann, Victor, and appellant went into the downstairs closet, and Franklin thought they were going to smoke marijuana. After about thirty seconds, he came back out because he realized that they were going to do something else. Franklin left the apartment, leaving appellant, Victor, and Corriann in the closet.

Franklin went home and went to sleep in the bedroom he shared with Victor. Later that night, appellant and Victor came in through the bedroom window and the noise woke up Franklin. They spoke briefly, and Franklin said appellant had to leave. Appellant appeared angry, but he left, and Franklin stayed up to talk with Victor for a while.

Arturo Flores had known Corriann for several months and considered her a friend. He spent time with her weekly because her apartment complex was across the street from the Bays Apartments where he lived. Arturo had known appellant for a long time, and he had shown appellant the vacant apartment at the Bays where Arturo sometimes smoked marijuana. Arturo also went to Candy's with Corriann and appellant, but not in February, and never when Victor was present.

On February 9, around 2:00 a.m., Arturo found that he could not sleep. He rolled a joint, and he decided to go smoke it in the vacant apartment he had shown to appellant. Arturo usually smoked on the upper floor inside the apartment. When he arrived, he went in through the front door, which was closed and unlocked.

Arturo turned around after he closed the door and he immediately saw a body on the floor in the living room. The body was so damaged that Arturo did not recognize it as his friend Corriann; he thought it was the body of an older woman. Her right eye was particularly damaged. Arturo thought that she was dead. He got scared and he ran to the apartment of two brothers he knew who lived in the complex.

The two men worked as IT engineers and their job kept them up late at night. Arturo knocked on their door around 4:00 a.m., appearing scared and distraught. Arturo repeatedly told them that he badly needed their assistance, and he kept saying "[s]he's hurt bad" and "she needs help." One of the men was ex–military and the other had some CPR training, so they went to help.

Arturo led them to the vacant apartment, and when they arrived, Arturo stayed outside, still visibly upset. The apartment had no electricity and no lights, and was very cold inside. One brother used a small flashlight to illuminate part of the living room. Inside, he saw a woman on the floor, but she did not move or respond to his verbal commands. He went into the apartment to see if she had a pulse.

When the man approached, he saw that "[s]he didn't have a face[,]" there was "broken porcelain everywhere from the toilet tank lid[,]" and "blood on the walls." He started to check for a pulse, but she was ice cold, so he backed out of the apartment and called 9–1–1.

When police arrived, they found the body naked from the waist down, with a Rob Zombie t-shirt on and a black bra on top of the t-shirt. Because of the exten-

sive trauma to the face, a forensic odontologist[2] was called in to assist with the identification of the body. Using dental records and ex-rays, the forensic odontologist identified the body as Corriann's.

It was still dark outside when the crime scene investigator arrived. The apartment showed no sign of forced entry, and it was very dark inside. Photographs taken by investigators showed that Corriann's body lay within sight of the front door. Black capri pants and blue panties were found nearby. Around the body, the crime scene investigator observed the remnants of a porcelain toilet tank lid that had broken into numerous pieces. A small half-bathroom on the first floor had a toilet without a tank lid.

Corriann sustained significant head and face injuries. In addition, the crime scene investigator found Corriann's body had two curtain rods inserted into her anus. The ends of the rods visibly protruded. Corriann's body had puncture wounds along the abdomen, and someone had carved from her chest to her stomach an inverted cross. The cut demonstrated that her bra and shirt had been removed or pushed back when the mark was made. Her sock had been rolled off, her shin had blood on it, and there was dirt near her ankle.

A small coat closet located under the stairs had one black shoe in it and evidence of a bloodletting event. The crime scene investigator believed the first part of the events occurred in the closet because of a bloodstain on the sloping ceiling that appeared to have been made by blood-soaked hair consistent with someone's head having struck it. The closet carpet had evidence of blood transfer, as well as on the closet door and wall. He consid-

---

**2.** A forensic odontologist is a dentist who is trained to assist law enforcement with the identification of human remains through dental examination.

ered the pattern on the closet door consistent with someone on their knees having pushed open the door.

Blood splatter evidence indicated that it was possible that the closet door stood open when the attacker caused Corriann's additional injuries because the wall had a void in the pattern of castoff blood where the door would have blocked it. The crime scene investigator observed castoff blood stains on another part of the wall consistent with Corriann being outside of the closet while someone repeatedly hit her with a large object. Someone had also drawn an inverted cross in blood on the wall, and a pentagram in pencil.

Dr. Albert Chu performed the autopsy on Corriann's body. Because he was not available at the time of trial, the Harris County Institute for Forensic Sciences assigned Dr. Morna Gonsoulin to review the reports and photographs taken during the autopsy to reach her own opinions about Corriann's death. Dr. Gonsoulin was unable to determine exactly how many times the perpetrator struck Corriann with an object, but her body showed evidence of both blunt and sharp force injuries consistent with the toilet tank lid breaking and causing both sets of injuries. Corriann's left eye was less damaged than her right eye, but it had evidence of hemorrhaging, injury to the eye's lining, and internal injuries.

Dr. Gonsoulin explained that although the eyes sometimes provide evidence of strangulation, Corriann's left eye could not because of the amount of blood caused by hemorrhaging. Although a purple discoloration or contusion was visible on Corriann's neck, Dr. Gonsoulin could not conclude that Corriann was strangled; however, she also could not rule it out.

Corriann's right eye was almost completely destroyed. Dr. Gonsoulin opined that although some of the right eye injuries may have been caused by the porcelain, the completely flattened sheet of tissue which had been her right eye was more consistent with insertion of a rod into the eye socket. X-rays and photographs of the head revealed a piece of a rod with a hook on the end lodged behind the left eye. The wound track was consistent with the attacker pushing the rod from the right eye socket to the other side toward the left eye. The attacker gouged the rod with so much force that it went through three sets of bones. Dr. Gonsoulin opined that, because the amount of hemorrhaging indicated that Corriann had still blood pressure when the eye injuries were inflicted, Corriann was alive at the time.

The two rods recovered from Corriann's anus were 25 and 29 inches long. Dr. Chu noted that they were each inserted 19 inches into her body. The rods went into her abdomen and almost into her chest cavity.[3] One rod with a hook on the end went through her liver and stopped just before her ribcage. The second rod went almost to her waist. Dr. Chu had previously said that he could not definitely say if some of the injuries were inflicted before Corriann's death due to early decomposition of the body. Dr. Gonsoulin disagreed with Dr. Chu's conclusion, however, and determined to within a reasonable degree of medical certainty that Corriann was alive, at least initially, when the rods entered her body because the wound track showed evidence of hemorrhaging consistent with blood pressure when the rod perforated her anus, rectum, and psoas

3. Dr. Chu also concluded that "at least one of the rods had been forcefully and repeatedly pushed into [Corriann's] body."

muscle. She also disagreed with Dr. Chu's assessment of decomposition based on the 100 milliliters of blood in Corriann's abdomen instead of the decomposition fluid hemoperitoneum.

Corriann's body also had numerous puncture wounds along her neck, some of which appeared to have occurred before her death, and others around the time of or after her death. The wounds were fairly deep—going through muscle—indicating that the attacker used a great deal of force. Dr. Gonsoulin concluded that the injuries were consistent with a screwdriver recovered by police after interviewing Victor. The tool punctured Corriann's jugular vein at least four times and pierced her right carotid artery so deeply that it almost reached her spinal column. According to Dr. Gonsoulin, these injuries caused significant internal bleeding and alone might have caused Corriann's death, or the blunt and sharp force trauma may have independently killed her.

Additional trauma was found to the vaginal area of Corriann's body, and foreign material consistent with sheetrock was inserted into the opening of the vagina. Dr. Gonsoulin could not conclusively determine whether the cause of the trauma was consensual or non-consensual sexual activity, but if it was consensual the sex would have to have been rough to cause the trauma.

The carving on Corriann's abdomen occurred after her death and was consistent with being carved using a screwdriver. Corriann's body also had evidence of slap marks on her abdomen, pelvis, and legs consistent with the shape of one of the rods. Dr. Gonsoulin opined that the marks were made before Corriann's death, and showed that significant force was used to cause the injuries. Additional puncture wounds on the chest and abdomen were consistent with the screwdriver and were made after Corriann's death, but other

puncture wounds, including some on her breast, occurred before her death. Dr. Chu noted that Corriann sustained a total of sixty-one puncture wounds and had fifteen lacerations to her head.

Dr. Gonsoulin concluded that the manner of Corriann's death was a homicide, and the cause of her death was the blunt and sharp force injuries. The sharp force injuries were consistent with both the toilet lid and a screwdriver.

Appellant soon began telling others what he and Victor had done. Two days after Corriann's death, appellant called his sister, Hisel Reyes, and asked her to come to his mother's apartment where he lived. Appellant told her that he had killed a girl. He said that "he was having a threesome with her and Victor" when she bit his "dick" and he hit her. After he hit her, she tried to run but he and Victor brought her back. Appellant further confided to Hisel that Victor "wrapped [a belt] around her neck" and pulled on it. He admitted that he and Victor stuck window blind rods "up her butt" and stabbed her with a screwdriver.

Victor's conversation with Hisel was overheard by Agapita Gonzalez, the mother of appellant's child. Agapita heard appellant name the girl he killed as Corriann Cervantes. Afterwards, Agapita talked to Hisel about the conversation. Agapita also confronted appellant and asked why he killed Corriann, and appellant told her "[i]t was because somebody wanted her soul." Agapita then contacted a police officer she knew to report appellant. Having lived with him, she identified photographs taken of his bedside table and in the kitchen that showed an upsidedown cross, a pentagram, and "666" carved or written onto items in his home.

Appellant also confided the details of his crime to others. The morning after the

murder, Leo Siverand, a close friend of appellant's, received a message to pick him up at a Kroger not far from the crime scene. Leo and his girlfriend, Maranda Leal, drove to the Kroger. Appellant looked pale and said he had "hit a lick" the night before, possibly meaning that he robbed someone or "came into some money" another way. Appellant also complained about his wrist or arm hurting, and his hand appeared swollen. Appellant asked Leo what he should do with his clothes. Leo told him to throw them away, and he watched as appellant threw his clothes in the apartment trash bin.

Later in the afternoon, appellant, Leo, and some other friends were rapping to each other when appellant said:

It was my first time; so, my homey showed me the ropes. And we ran a[tr]ain[4] on this 'ho. Then my homey grabbed a belt and started choking her; and the bitch said, Why you doing this? And we told her to shut the fuck up. And then we beat her and then she tried to run and we grabbed her and started stabbing her. And she asked us why, and we said we're helping ... you to sell our souls.

Appellant also used the name "Victor" during the rap and mentioned that Victor said, "Let's kill the bitch." Leo said that the rap was "a different kind of rap" because appellant had never rapped that way before. He said that it sounded too real to make up. As appellant rapped, everyone in the room became quiet. Ultimately, Leo was not sure if he should take the rap seriously and he did not tell police until months later when a friend gave him a homicide investigator's number and Leo called him.

Leo's girlfriend, Maranda Leal, testified that she was with Leo and the others and remembered appellant's rap. She stated that appellant rapped that he "stabbed her while he was having sex with her and that the devil told him to do it." Later, appellant sat on a sofa with her and admitted that "he killed a girl and that he stabbed her a lot of times and choked her with a belt and hit her in the head with the top of the toilet thing." Appellant also admitted that the toilet tank lid "broke in half," and "he kept hitting her in the head with [the other piece] and ... he also hit her with an ashtray." Finally, appellant admitted that "he had the two curtain rod things and he stuck those ... in her ass."

Appellant told Maranda that the girl he killed "asked him why he was doing this" and that she had "tried to run." When the girl tried to run, appellant said that "[h]e ... clotheslined her with his wrist and arm and knocked her down" and his arm was hurting as a result. Appellant also stated that the girl tried to run after he had stabbed her.

As appellant told Maranda these things, he was laughing "[l]ike it was funny." And he was laughing when he said that he "got the curtain rods and shoved them inside her until ... he felt her insides breaking." Maranda asked appellant why he would do something like that and he claimed that he wanted to "end her suffering." Appellant showed her a cell phone photograph of three people having sex and told her that he took the picture. The photograph showed him having sex with a girl while her head was above another man's lap. The photograph did not show the girl's face. Maranda found appellant's story so unbelievable that she questioned it until she found out about Corriann's murder.

4. Although originally reported as "chain," Leo explained that appellant said "ran a train," meaning to have sex with two or more people at the same time.

After speaking with Hisel and Agapita, police obtained an arrest warrant for appellant. Appellant voluntarily provided a buccal swab with his DNA and consented to a search of his cell phone. The search of appellant's cell phone revealed two photographs consistent with the picture appellant showed to Maranda. The metadata from the phone confirmed that the photographs were taken shortly after 10:00 p.m. on the day Corriann disappeared. The lead investigator identified Victor Alas, Corriann, and appellant in the photographs. Appellant's phone also contained a screen shot of a news article titled, "Woman's body found in vacant Clear Lake apartment."

The lead investigator put a watch on appellant's jail mail. Letters identified as coming from appellant stated:

> My mistakes are my mistakes. Nobody I don't blame no one, but the thing that came in my life from the first time I sold my soul. I hope you understand it wasn't me that day. I remember everything, but I know it wasn't me. I couldn't do nothing about it because he was standing there watching me and Victor do our job the way he wanted it to be done. My life is fucked up. I know that I will come out of this situation I put myself in since day one.
>
> * * *
>
> I was sick-minded, stabbing that 'ho 60 times. It's all good. It's what the devil asked for.

DNA analysis showed the handle of the recovered screwdriver had a mixture that could not exclude DNA from Corriann or Victor Alas. The analyst acknowledged that if Victor were the last person to hold the screwdriver by its handle, his DNA could mask the DNA of others who may have touched it. A portion of Corriann's sock contained a mixture that could not exclude appellant or Corriann. A portion of a stain on the black capri pants contained male DNA from at least three individuals, and appellant could not be excluded as a possible contributor to the major component of the mixture. Additionally, a swab taken from Corriann's mouth during her autopsy tested positive for semen, and the test could not exclude appellant as a possible contributor to the DNA contained on the swab along with Corriann's DNA. The DNA on the oral swab also could have been consistent with appellant's skin cells coming off in Corriann's mouth.

The defense argued that the jury did not have sufficient evidence from which to find that appellant committed either kidnapping or aggravated sexual assault to make the murder a capital crime. The jury rejected this defense and returned a guilty verdict on the charged offense, rather than the lesser offense of murder.

## ISSUES AND ANALYSIS

On appeal, appellant contends that: (1) the evidence is insufficient to prove beyond a reasonable doubt that he committed the murder in the course of committing kidnapping or aggravated sexual assault; and (2) the trial court reversibly erred when it admitted into evidence gruesome photographs and video from the crime scene and autopsy over appellant's objection that the probative value of the images was substantially outweighed by the danger of unfair prejudice.

## I. Sufficiency of the Evidence to Support the Capital Murder Conviction

In his first issue, appellant contends that the evidence is insufficient to prove that he committed capital murder as either the principal actor or as a party. To establish the offense of capital murder, the State had to prove that appellant committed murder in the course of committing or attempting to commit the offenses of kid-

napping or aggravated sexual assault. *See* Tex. Penal Code § 19.03(a)(2). Appellant contends that the evidence was insufficient to prove either a kidnapping or aggravated sexual assault. The State argues that the evidence is more than sufficient to prove each predicate felony and that it presented overwhelming evidence of appellant's guilt in a capital murder.

### A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex.Crim.App.2011). In determining whether the evidence is legally sufficient to support a conviction, we view the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Id.* at 860; *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim.App.2011). The jury is the sole judge of the weight and credibility of the evidence. *Adames*, 353 S.W.3d at 860; *see Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim.App.2010) (appellate court may not substitute its judgment for that of the fact finder).

### B. Sufficiency of the Evidence of Kidnapping

A kidnapping occurs when a person knowingly or intentionally abducts a person. Tex. Penal Code § 20.03(a). To "abduct" means to restrain a person with the intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found, or by using or

threatening to use deadly force. *Id.* § 20.01(2). To "restrain" means to restrict the person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. *Id.* § 20.01(1). The State may show a lack of consent by proof of force, intimidation, or deception. *Id.* § 20.01(A). The Court of Criminal Appeals has explained that the offense of kidnapping "is complete when the restraint is accomplished and there is evidence that the defendant intended to restrain the victim by either secretion or the use or threat to use deadly force." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App.2003) (citing *Mason v. State*, 905 S.W.2d 570, 575 (Tex.Crim.App.1995)).

Appellant contends that the evidence does not support a finding that appellant, either acting on his own or in concert with Victor Alas, actually abducted Corriann on the night of her death. To the contrary, appellant argues, the evidence shows that Corriann came of her own volition in the company of friends to the apartment where she met up with appellant, Victor Alas, and several other persons, and that she willingly accompanied appellant, Victor, and Franklin Flores down the stairs and to the vacant apartment. Further, appellant argues, when Franklin left the vacant apartment, there is no evidence that Corriann tried to leave with him or was in any way prevented from leaving by appellant or Victor.

Appellant's argument presumes that Corriann initially went to the vacant apartment with appellant and Victor. Assuming for purposes of analysis that appellant's contention is supported by the evidence,[5] the fact that a victim initially

---

5. We note that the evidence shows that Corriann was so intoxicated that she could not

walk without assistance; she said that she wanted to go to a friend's apartment nearby;

accompanies her assailants voluntarily "does not preclude the possibility that at sometime during the course of the journey ... a murder in the course of a kidnapping subsequently occurred." *Boyle v. State*, 820 S.W.2d 122, 138 (Tex.Crim.App. 1989); *see also Megas v. State*, 68 S.W.3d 234, 241 (Tex.App.—Houston [1st Dist.] 2002, pet. ref'd) (evidence that complainant was with appellant voluntarily at beginning of evening did not preclude jury's finding that appellant kidnapped complainant). Further, the offense of kidnapping does not require that the defendant restrain the victim for any particular period of time or that the victim be moved any particular distance. *Santellan v. State*, 939 S.W.2d 155, 163 (Tex.Crim.App.1997); *Brimage v. State*, 918 S.W.2d 466, 475 (Tex.Crim.App.1994).

 Evidence of the events subsequent to Corriann's arrival at the vacant apartment with appellant and Victor, including Victor's own statements, support a reasonable jury's finding that appellant and Victor abducted Corriann. Appellant told his sister Hisel that he hit Corriann and she tried to run, but "they brought her back" and Victor wrapped a belt around her neck and pulled on it. Appellant admitted to Maranda that when Corriann tried to run, he "clotheslined her with his wrist and arm and knocked her down." Both Maranda and Leo heard Victor complain about the injuries to his wrist and arm the day after the murder, and Leo testified that appellant's hand was swollen. And, in a rap witnessed by Leo and others, appellant stated that Corriann tried to escape from him and Victor but they "grabbed her,"

preventing her from leaving the vacant apartment.

The physical evidence also supports the jury's finding that appellant abducted Corriann. Police found significant blood evidence in the downstairs closet, which appeared to be the same closet in which appellant took photographs of Corriann engaged in a sex act with him and Victor before she sustained visible injuries and became covered in blood. The closet door had evidence consistent with someone on their knees bleeding while leaving the closet, and the angled ceiling had bloodstains consistent with Corriann's bloody hair causing them. The blood evidence continued into the living room with evidence that the closet door was open while appellant struck Corriann with the toilet lid because of the lack of castoff bloodstains behind the open door. The physical evidence also supports appellant's statements that Corriann tried to run, but he and Victor stopped her from escaping the apartment by using deadly force to prevent her liberation, including repeatedly stabbing her and striking her head with the toilet tank lid.

Finally, there is some evidence to support appellant's claim that he and Victor restrained Corriann by wrapping a belt around her neck and choking her with it. Although Corriann's autopsy did not reveal evidence consistent with death from strangulation, a purple discoloration or contusion on the neck was visible. Dr. Gonsoulin opined that the lack of significant injuries to Corriann's neck could have resulted from the perpetrator initially

and appellant and Victor told Candy that they would take her there, not to a vacant apartment. Franklin, who left with them, testified that he thought they were taking Corriann home, but then they went to the vacant apartment instead. Franklin also testified that appellant and Victor had to "help" Corriann up the stairs to the apartment and into the closet. Although Franklin stated on cross-examination that Corriann appeared to leave Candy's apartment voluntarily, there was no evidence that Corriann consented to going to the vacant apartment.

choking Corriann, but then stopping to cause other mortal injuries with the blunt and sharp force trauma.

Viewed in the light most favorable to the verdict, a reasonable jury could have concluded that appellant and Victor knowingly and intentionally abducted Corriann when they prevented her from leaving the apartment after she fled the closet. *See* Tex. Penal Code §§ 20.01, 20.03. Therefore, the jury could have reasonably found, based on the physical evidence and appellant's statements, that appellant committed or was attempting to kidnap Corriann when he murdered her. *See id.* § 19.03(a)(2).

## C. Sufficiency of the Evidence of Aggravated Sexual Assault

Having concluded that the evidence is sufficient to support the jury's finding that appellant committed murder in the course of a kidnapping, we need not reach appellant's issue concerning the sufficiency of the evidence of sexual assault to affirm the judgment. *See Guevara v. State,* 152 S.W.3d 45, 52 (Tex.Crim.App.2004) ("We have consistently held that, when multiple theories are submitted to the jury, the evidence is sufficient to support a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury."). Nevertheless, we will address the alternate theory supporting appellant's conviction for capital murder in the interest of completely disposing of appellant's issues.

A person commits aggravated sexual assault when he intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without the person's consent, or if he causes the penetration of the person's mouth with his sexual organ without consent. *See* Tex. Penal Code § 22.021(a)(1)(A)(i)–(ii). Additionally, he must cause serious bodily injury, attempt to cause a death during the course of the same criminal episode, or use or exhibit a deadly weapon in the course of the same criminal episode. *See id.* § 22.021(2)(A)(i), (iv). In the alternative, he commits the offense if he "acts in concert with another who engages in ... [the penetration of the anus, sexual organ, or mouth] ... directed toward the same victim and occurring during the course of the same criminal episode." *Id.* § 22.021(2)(A)(v).

Appellant contends that there is no evidence that the sexual encounter was nonconsensual until after Corriann bit appellant's penis, after which he became angry and hit her.[6] Therefore, appellant argues, the only evidence of any penetration of Corriann's genitals, mouth, or anus after that point "is the curtain rods being shoved into her anus." Because Texas law defines a "person" as a "human being who is alive," appellant maintains that if Corriann was not alive at the time that the curtain rods were used to penetrate her anus, then legally there was no aggravated sexual assault. *See* Tex. Penal Code §§ 1.07(a)(38) & 1.07(a)(26).

Appellant notes that Dr. Chu, the forensic pathologist who actually performed the autopsy on Corriann, had advised the State that he could not definitely say that the curtain rods were inserted before Corriann's death. According to appellant, Dr. Gonsoulin, who was not present at the autopsy but had reviewed Dr. Chu's report and photographs in forming her opinions, conceded that Corriann had injuries inflict-

---

**6.** Again, Corriann was extremely intoxicated that night, and there was no evidence one way or another whether she consented to the sexual threesome or was able to resist. Additionally, the jury could have concluded that Corriann bit appellant's penis because the sex acts performed on her were not voluntary and consensual.

ed both before and after her death, and that relying on the autopsy photographs made the determination more difficult than if she had been able to observe the actual body as Dr. Chu had done. Therefore, appellant argues, reasonable doubt exists because the State's evidence was "at best inconclusive" as to whether the curtain rods were inserted into Corriann's anus while she was still alive.

■ However, there was some evidence of vaginal trauma that, while not definitive for sexual assault, could have supported an inference that the encounter was nonconsensual when viewed in the context of the events leading up to the encounter and appellant's later statements that he stabbed a girl while having sex with her and that his "homey" grabbed a belt and choked her. The jury could reasonably infer from all the evidence, including the fact that appellant stabbed Corriann repeatedly, likely choked her with a belt, pummeled her with a porcelain toilet tank lid, and gouged her eye sufficiently to destroy one eyeball, that Corriann did not consent and that the act met the aggravating elements necessary to raise it to an aggravated sexual assault.

Further, assuming that appellant's premise is correct that the only evidence that would support a finding of aggravated sexual assault is the insertion of the rods into the anus before death, we disagree that the evidence is inconclusive. Dr. Gonsoulin provided the jury with a detailed explanation of the reasons for her conclusions that certain of Corriann's injuries were inflicted before death based on the evidence she reviewed. She testified to within a reasonable degree of medical certainty that at least the injuries to Corriann's anus, rectum, and psoas muscle occurred before her death, based on the significant evidence of hemorrhaging that demonstrated she had blood pressure when appellant inflicted those wounds. The jury was also able to observe the photographs for themselves when considering the basis for Dr. Gonsoulin's opinions.

In contrast, Dr. Chu did not state in the written autopsy report whether he thought the injuries occurred before or after Corriann's death. The jury saw only his handwritten notes that, as to the insertion of the rods, at least some of the injuries occurred before death "given the hemorrhage that [he] observed; however, "[he] would not say that this was definite, as the interpretation was somewhat more difficult due to early decomposition." Dr. Chu gave no definitive opinion, but indicated that he considered at least some of the injurIES to have occurred after death. Dr. Gonsoulin disputed Dr. Chu's concern about decomposition because of the blood present in Corriann's abdomen during the autopsy and the distinct lack of decomposition fluid. The jury reasonably chose to credit Dr. Gonsoulin's medical opinion over Dr. Chu's inconclusive notes and we defer to its resolution of the conflicting evidence.

Based on the physical evidence and Dr. Gonsoulin's opinions, the jury reasonably could have concluded that Corriann was the victim of a sexual assault when two curtain rods penetrated Corriann's anus with such force that they caused her death after they pierced her anus, rectum, psoas muscle, and entered her liver. The jury also had appellant's own words that he "got the curtain rods and shoved them inside of her until—until he felt her insides breaking" as he laughingly claimed he did to "end her suffering." Therefore, the evidence was legally sufficient to support the jury's finding that appellant murdered Corriann in the course of committing aggravated sexual assault.

### D. Summary of Analysis

Based on the evidence and reasonable inferences drawn from the evidence, the jury reasonably could have found that appellant was guilty of capital murder because legally sufficient evidence supports the jury's finding that appellant intentionally or knowingly caused the death of Corriann Cervantes in the course of intentionally committing or attempting to commit either kidnapping or aggravated sexual assault. We overrule appellant's first issue.

## II. Admission of Photographs and Crime Scene Video

In his second issue, appellant contends that the trial court committed reversible error when it admitted into evidence extremely gruesome and inflammatory photographs and the crime scene video when the probative value of these items was clearly substantially outweighed by the danger of unfair prejudice to appellant. Appellant specifically complains about the video, fourteen photographs of the crime scene, and nine autopsy photographs.

Rule 403 of the Texas Rules of Evidence provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403. With regard to photographs and other visual depictions such as videos, the images are inadmissible under Rule 403 when they have an undue tendency to suggest a decision on an emotional basis and the probative value of the photograph or video image is substantially outweighed by such unfair prejudice. *Newbury v. State*, 135 S.W.3d 22, 43–44 (Tex.Crim.App.2004). Autopsy photographs will generally be admissible under Rule 403 unless they depict mutilation caused by the autopsy itself.

*Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim.App.1998).

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of photographs offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Davis v. State*, 313 S.W.3d 317, 331 (Tex.Crim.App.2010); *Williams v. State*, 301 S.W.3d 675, 690 (Tex.Crim.App.2009). We evaluate the admissibility of photographs over an objection using an abuse-of-discretion standard of review. *Davis*, 313 S.W.3d at 331.

At trial, appellant objected to most of the photographs of Corriann's body at the crime scene, as well as the crime scene video. The prosecutor pointed out that the State selected only 79 of the 360 pictures taken at the scene. The trial judge either sustained objections to or the State withdrew three of the originally offered photographs. The trial court found that the prejudicial effect of the remaining photographs and the video did not substantially outweigh their probative value. The State also offered 29 of the 172 photographs taken by the medical examiner during the autopsy. The trial judge excluded two of the photographs and held that the probative value outweighed the prejudicial effect of the remainder of the photographs.

Appellant complains that fourteen of the crime scene photographs, State's exhibits 17–20, 22–24, 28, 30, 34, 41, 75–76, and 79, contain "extremely gruesome and inflammatory depictions of the complainant's bloody and largely unclothed body," including an "extreme and particularly graphic" close-up of Corriann's bat-

tered and bloody face and a close-up of her exposed breasts. But the fact that the photographs are gruesome does not, without more, render the probative value of the exhibits outweighed by any unfair prejudice. *See Narvaiz v. State,* 840 S.W.2d 415, 430 (Tex.Crim.App.1992). Further, the photograph showing exposed breasts was necessary to reveal the length of the inverted cross carved on the torso and otherwise partially covered by clothing. These exhibits merely depict the crime scene and the condition of the victim's body. *See Williams,* 301 S.W.3d at 693; *Narvaiz,* 840 S.W.2d at 430. Therefore, we hold that the trial court did not abuse its discretion by admitting the exhibits.

■ Appellant also argues that State's exhibit 119, the crime scene video, contains cumulative images of the same gruesome photographs. The Court of Criminal Appeals has held, however, that a videotape and still photographs are not entirely cumulative of each other, as a videotape offers a panoramic view of the scene that still photographs often do not offer. *Ripkowski v. State,* 61 S.W.3d 378, 392 (Tex.Crim.App.2001); *see also Flores v. State,* 915 S.W.2d 651, 652 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd) (holding that trial court did not abuse its discretion in admitting videotape that portrayed the crime scene in considerable detail and offered a three dimensional perspective). Moreover, the panoramic view of the crime scene was essential not only to the jury's consideration of the murder, but also to the kidnapping and sexual assault elements, because it showed the relationship between the blood evidence in the closet, the proximity of Corriann's body to the front door, the proximity of her body to the downstairs bathroom where the toilet tank missing a lid was located, and the upstairs window blinds where the curtain rods were obtained. As in *Gordon v.*

*State,* the video in this case is "highly probative of the fact and manner of the decedent's death and the killer's culpable mental state." *See* 784 S.W.2d 410, 412 (Tex.Crim.App.1990). The trial court did not abuse its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the probative value of the crime scene video.

■ Finally, appellant asserts that nine autopsy photographs contain "extremely gruesome depictions of the complainant's face and various internal organs during the autopsy process." State's exhibits 174 and 175 show different views of the injuries to the face, and exhibit 177 depicts the gouging to the right eye by a rod and the location of the pupil. Exhibits 185, 186, and 187 depict the internal injuries to the anus, rectum, and psoas muscle caused by the curtain rods inserted into the anus, illustrating for the jury the basis for Dr. Gonsoulin's opinion that the injuries to these internal organs were made before death. Exhibit 188 shows damage to the liver caused by the insertion of the rods. Exhibit 190 is a side view of the face showing the puncture wounds to the neck, and exhibit 191 depicts an internal view of the same area. The internal view reveals the extent and depth of injuries to the muscles and blood vessels, including the jugular vein, consistent with stabbing with a screwdriver using great force. Dr. Gonsoulin opined that the neck punctures depicted in the photograph occurred before Corriann's death and likely contributed to her death. Thus, the autopsy photographs, although gruesome, were highly probative to show the full extent of the injuries appellant inflicted on Corriann and to prove that she was still alive, at least initially, when appellant committed the aggravated sexual assault. *See Williams,* 301 S.W.3d at 692–93; *Gallo v. State,* 239 S.W.3d 757, 763 (Tex.Crim.App.2007).

We hold that the trial court did not abuse its discretion in admitting the challenged photographs.

## CONCLUSION

We overrule appellant's issues and affirm the trial court's judgment.