

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-24-00068-CR

---

DERRIS LEE REYNOLDS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the County Criminal Court No. 6
Tarrant County, Texas
Trial Court No. 1793529

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

Derris Lee Reynolds appeals[1] his convictions for terroristic threat[2] and unlawful restraint.[3] Because we find that the evidence (1) establishes his intent to put the victim in fear of imminent serious bodily injury, (2) shows he unlawfully restrained his victim, and (3) shows he intended to unlawfully restrain the victim, we affirm the trial court's judgment.[4]

## I.    Trial Evidence

Reynolds was thirty-eight years old when he returned to Arlington to live with his mother. Several months prior, he had moved to California to live with his father. Due to Reynolds's behavior and mental-health problems, "his father just dropped him off at the airport" in California "and paid for his ticket" back to North Texas, according to Reynolds's mother, Jill Reynolds (Jill).[5] Jill picked him up from the airport and took him to her apartment in Arlington. Within two days, Reynolds began exhibiting paranoia and violent behavior.

On August 22, 2023, Jill and Reynolds drove to a UPS store to scan paperwork for Reynolds's application for college. On the way, Reynolds accused Jill of not "want[ing] him to

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We are unaware of any conflict between precedent of the Second Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 22.07.

[3]*See* TEX. PENAL CODE ANN. §§ 20.01(1)(A), 20.02 (Supp.).

[4]Reynolds was sentenced to 180-days confinement in the Tarrant County Jail for each offense and was found to have already served more than 180 days in jail.

[5]The family hoped that, while in California, Reynolds could work for his father's company and receive better healthcare than what was available in Texas, but that arrangement did not work out. Jill testified that Reynolds's "father couldn't take him anymore, and [Reynolds] wouldn't go to a mental[-]health facility, so his father sent him back" to the Dallas Metroplex.

go to school" and "trying to take his school money and . . . different conspiracies and paranoia stuff." They argued about events in California with his father, and then Reynolds "went ballistic . . . just a lot of cuss words . . . punching [her] car, hitting the window, the door, his hands flailing." Jill stated, "It was just awful." Reynolds threatened to kill Jill, but from the record, it is not clear if those threats were made before the errand or during the car ride.

During the car ride, Reynolds began spitting on Jill and exhibited strange, violent behavior, which she described as "screaming, pounding the car, pounding, moving his feet, moving his hand, and he hit[] [her] . . . ." She stated, "It wasn't like a punch." But she said that Reynolds made contact with her ear and neck, that it hurt, and that she was scared.

Jill testified that, when they got home from the errand, Reynolds "held [her] hostage" in a room in the apartment. He screamed at and spat on her and accused her of being a "clone" of his real mother. Jill "was held hostage" in that room until she finished a task for Reynolds's school application. At that point, she told Reynolds, "Let me go." She testified, "[H]e stood in the door screaming and his hands are flailing, like he does, telling me all these things." According to Jill, Reynolds "finally . . . went to the side," and she was able to leave the room and then the apartment. She then called the police, her daughter, and a family friend for help. Those events led to Reynolds's arrest and prosecution.[6]

On appeal, Reynolds claims that the evidence was insufficient to prove (1) his intent to place Jill in fear of imminent seriously bodily injury, (2) that he unlawfully restrained Jill, and (3) that he intentionally or knowingly unlawfully restrained Jill.

---

[6]Reynolds was also charged with assault causing bodily injury against a family member. *See* TEX. PENAL CODE ANN. § 22.01 (Supp.). He was acquitted of that charge.

## II.     Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as

4

the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

## III. Analysis: Terroristic Threat

To prove Reynolds committed a terroristic threat, as alleged in the complaint, the State had to prove that Reynolds intentionally threatened to murder or commit aggravated assault (crimes involving violence) against Jill with the intent to place her in fear of imminent[7] serious

---

[7]"Imminent means '[n]ear at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous.'" *In re A.C.*, 48 S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied) (alteration in original) (quoting BLACK'S LAW DICTIONARY 750 (6th ed.1990)).

bodily injury.[8]   The requisite intent can be inferred from the "acts, words and conduct" of the accused.  *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018).  "The accused's threat of violence, made with the intent to place the victim in fear of imminent serious bodily injury, is what constitutes the offense."  *Williams v. State*, 194 S.W.3d 568, 574 (Tex. App.—Houston [14th Dist.] 2006) (citing *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982)), *aff'd*, 252 S.W.3d 353 (Tex. Crim. App. 2008).  "However, the accused's intent cannot be determined merely from what the victim thought at the time of the offense.  Indeed, for this offense to be completed it is not necessary that the victim or anyone else was actually placed in fear of imminent serious bodily injury."  *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982).

Jill testified that, while driving in the car, she was frightened by Reynolds's behavior, which included spitting and cursing at her, "pounding the car," and hitting her around her ear and neck.  Jill also explained that, either on the drive or before, Reynolds had threatened to murder her.  She told the jury that she was frightened by Reynolds's behavior in the car and that he hurt her when he struck her.  Jill testified that Reynolds had been exhibiting very bizarre and paranoid

---

[8]The information alleged that Reynolds:

> DID INTENTIONALLY THREATEN TO COMMIT MURDER OR AGGRAVATED ASSAULT, AN OFFENSE INVOLVING VIOLENCE, AGAINST ANY PERSON OR PROPERTY, WITH INTENT TO PLACE JILL REYNOLDS, A MEMBER OF THE DEFENDANT'S FAMILY OR HOUSEHOLD, IN FEAR OF IMMINENT SERIOUS BODY INJURY.

*See* TEX. PENAL CODE ANN. § 22.07(a)(2), (c)(1).  The date of the offense and venue are not challenged.  These allegations track the statutory elements of terroristic threat.  *See* TEX. PENAL CODE ANN. § 22.07(a)(2), (c)(1).  Such an offense is a class A misdemeanor.  TEX. PENAL CODE ANN. § 22.07(c)(1).

behavior all day and that such behavior was why Reynolds's father had sent him back to live with Jill.

Reynolds argues that the evidence was insufficient to show he intended to place Jill "in fear of imminent serious bodily injury." TEX. PENAL CODE ANN. § 22.07(a)(2). Reynolds concedes in his brief that it is "reasonable to infer[, from the testimony,] that he was angry." Even so, Reynolds argues that the evidence shows he was having a mental-health crisis[9] and that the evidence is insufficient to prove that he "spoke with a 'conscious objective or desire' to place [Jill] in fear of imminent serious bodily injury." *See* TEX. PENAL CODE ANN. § 6.03(a).

We disagree with Reynolds's assessment of the evidence. He told Jill he would kill her, and he called her a derogatory term, which Jill said was out of the ordinary for him. While he was making the threatening statements to Jill, Reynolds was spitting at her and "pounding the car," and he struck her at least once.[10] Reynolds had been exhibiting bizarre behavior all day. Jill testified that, the morning of the offenses, Reynolds was "stomping on people he s[aw], building barricades, anything, pillows, so that you [could not] see anything out of - - so nobody [could] see in from the window, grabbing a knife or whatever, having it by the barricades."[11]

---

[9]To the extent Reynolds argues that his mental-health issues negated his intent, there is nothing in the record to show how his symptoms "affected [his] ability to perceive that" he was placing her in fear of imminent serious bodily injury or, as discussed below, confining Jill or substantially interfering with her liberty. *Woods v. State*, 306 S.W.3d 905, 909 (Tex. App.—Beaumont 2010, no pet.); *see* TEX. PENAL CODE ANN. §§ 6.03(a), 20.01.

[10]Jill described that part of the car ride as "very frightening, very disgusting, and very horrible for [her] own child to be saying things about" her.

[11]Reynolds exhibited such behavior at his father's home, where he also "started accusing his family there that there was a big sex ring, prostitution going on in his father's home," and Reynolds believed that "his father was molesting his brother, that there was rape" of "his sisters," and that "there was a whorehouse."

Even after police arrived and arrested Reynolds, Jill was afraid "he'd get out and come back and kill" her.

In *Williams*, the appellant threatened an assistant principal at the school attended by Williams's child. *Williams*, 194 S.W.3d at 572. The assistant principal was "shocked" and "immediately feared for her safety" when Williams "invited [her] to . . . a beat down in the parking lot." *Id.* The assistant principal stated that she thought Williams "might 'come across the table or come around and try to strike [her].'" *Id.* That was sufficient to show Williams's intent to imminently cause the witness serious bodily injury. *Id.*

Jill's testimony is helpful in determining Reynolds's intent. From her descriptions of his conduct, it is reasonable to infer that Reynolds meant to threaten her and make her believe he would imminently cause her serious bodily injury. "One's acts are generally reliable circumstantial evidence of one's intent." *Rogers v. State*, 687 S.W.2d 337, 342 (Tex. Crim. App. 1985) (quoting *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.)).[12] As a result, we find that a rational jury could reasonably infer that Reynolds intended for Jill to fear that he meant to imminently cause her serious bodily injury.

For these reasons, we overrule Reynolds's first point of error.

---

[12]*See Mays v. State*, 318 S.W.3d 368, 380–81 (Tex. Crim. App. 2010). There, the State presented substantial evidence of Mays's "mental impairment at the time of" the murders. *Id.* at 380. And while the "mental-illness evidence explained [Mays's] actions and demonstrated his motive for killing the deputies—paranoia, suspicion, and distrust of the officers"—such evidence "did not rebut the culpable mental state of 'intentional or knowing' conduct or raise any legal justification or exoneration for the murders." *Id.* at 380–81.

## IV.    Analysis:  Unlawful Restraint

### A.    Jill Was Restrained

Reynolds argues there was no evidence that he "physically place[d] or h[e]ld [Jill] in one place, nor did he substantially restrict her movement."  Nothing in Section 20.02 requires the use or exhibition of physical acts.  *See* TEX. PENAL CODE ANN. § 20.02.  "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with [her] liberty, by moving [her] from one place to another or by confining [her]."  TEX. PENAL CODE ANN. § 20.01(1).  The statute imposes no minimal requirement or time limitation for restraint.  *Walton v. State*, 641 S.W.3d 861, 870 (Tex App.—Fort Worth 2022, pet. ref'd) (citing *Rogers*, 687 S.W.2d at 342).

"Confinement is not defined by the Penal Code.  We therefore use its common meaning when reviewing the evidence."  *Robinson v. State*, 568 S.W.3d 718, 723 (Tex. App.—Amarillo 2019, no pet.) (citing *Holmes v. State*, 873 S.W.2d 123, 126 (Tex. App.—Fort Worth 1994, no pet.).  "To confine means 'to shut up, imprison, immure, put or keep in detention, to relegate to certain limits.'"  *Id.* (quoting *Holmes*, 873 S.W.2d at 126).

In *Robinson*, the victim stayed in Robinson's "apartment for two days and nights, and chose not to leave on multiple occasions."  *Id.* at 722.  However, when the victim tried to leave to feed her cat, Robinson "hid her cell phone," "'grabbed' her by the hair and 'dragged' her back to the bedroom," *id.* at 720, refused her entreaties to be released, undressed her, tied her hands and feet, then sexually assaulted her.  *Id.* at 721.  The fact that she had previously been in the apartment willingly did not negate the ultimate unlawful restraint.  *Id.* at 724; *see also Reyes v.*

9

*State*, 491 S.W.3d 36, 45–46 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (acknowledging that "the fact that a victim initially accompanies her assailants voluntarily does not preclude" a finding the defendant kidnapped the victim).[13]

Here, Jill testified that, when they got home from the errand, she was held "hostage" in a room in the apartment. Reynolds told her that he was going to kill her. Jill also testified that she was held hostage in that room until she finished a task for Reynolds. She "had to sit there and do what he said[,] and he wouldn't let [her] out." Reynolds screamed and spat at her and told her she "was against him and . . . wasn't his real mother" but rather a "clone." Jill continued:

> He was saying that the ops - - that I was an opt (phonetic), meaning opposition, I believe, saying that he would kill me, that he would murder me, that I was a B, all kinds of horrible things to his mother, and wouldn't let me out until - - I was held hostage until I finished that school thing. And then I said, "Let me go." And he stood in the door screaming and his hands are flailing, like he does, telling me all these things. And then, finally, he went to the side and that's when I went out and then I got out the door.

All of that, in the context of Reynolds's behavior throughout the day, supports a rational inference by the jury that Reynolds confined Jill such that he substantially interfered with her liberty and did so without her consent. *See* TEX. PENAL CODE ANN. §§ 20.01, 20.02. As a result, we overrule Reynolds's second point of error.

---

[13]In *Jenkins v. State*, 248 S.W.3d 291 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd), the defendant "forced himself into" the victim's apartment and refused to leave when asked. *Id.* at 295. That proved restraint. *Id.* In *Walton*, the defendant refused to allow the victim to leave his truck and, under the influence of cocaine, drove dangerously and erratically at high speed, "swerving in and out of traffic," eventually running "a red light and hit[ting] a parked car." *Walton*, 641 S.W.3d at 865. That behavior was sufficient to prove unlawful restraint. *Id.* at 870; *see also Brimage v. State*, 918 S.W.2d 466 (Tex. Crim. App. 1994) (appellant was convicted of capital murder by killing the victim in the course of kidnapping her). In *Brimage*, the victim's restraint "began when [Brimage] dragged [her] down the hall of his home; it ended only with her death." *Id.* at 476; *see Phillips v. State*, 597 S.W.2d 929, 931–32 (Tex. Crim. App. [Panel Op.] 1980) (The defendant gave two hitchhikers a ride, and before letting them out, forced them to engage in sexual behavior with each other and then him. He did not release them, and they eventually escaped in his car while Phillips bought cigarettes.).

**B.      Unlawful Restraint:  Intent**

In his third point of error, Reynolds argues that the evidence was insufficient to prove he had the requisite intent (intentionally or knowingly) to commit unlawful restraint.  He points to the evidence of his paranoia and mental-health problems and, again, concedes that the record shows he was "angry and wanted [Jill] to submit a document online" for his school application. We refer to the above discussion about inference of intent from acts, words, and conduct of the accused.

After the threatening behavior in the car, when Reynolds and Jill returned home, Reynolds made Jill stay in a room until she completed a task for him on her computer.  He continued to scream at and spit on her, he accused her of not being his mother but some kind of opposition agent or clone, and he again threatened to kill her.  The jury could infer, from Reynolds's words, acts, and conduct, that he intended to restrain Jill, without her consent, by confining her to a room, and that he did so by force, intimidation, or deception.  The evidence is sufficient to prove that Reynolds had the requisite intent to commit unlawful restraint.  As a result, we overrule Reynolds's third point of error.

## V.       Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:       August 13, 2024
Date Decided:         September 24, 2024

Do Not Publish